Guy HECKER Plaintiff,

v.

MICRON TECHNOLOGY, INC.,
and Micron Electronics,
Inc. Defendants.

No. CIV. 96–0082–S–BLW.

United States District Court,
D. Idaho.

Aug. 21, 1997.

Allen B. Ellis, Ellis Brown & Sheils, Boise, John W. Clark, Mary E. Arand, Clark & Arand, Palo Alto, CA, for Guy Hecker, plaintiff.

Richard H. Greener, Daniel L. Glynn, Cosho, Humphrey Greener & Welsh, Boise, ID, Melvin R. Goldman, David G. Robertson, Christopher C. Cooke, Morrison & Foerster, San Francisco, CA, for Micron Technology Inc, defendants.

## MEMORANDUM DECISION

WINMILL, District Judge.

### INTRODUCTION

The Court has before it a motion for summary judgment filed by defendant Micron Technology, Inc. (MTI) and Micron Electronics, Inc. (MEI). The Court has heard oral argument and the motion is at issue. Plaintiff Guy Hecker asserts that he was fraudulently induced to transfer shares of stock to facilitate a merger. After examining the entire record, the Court finds that the defendants did not commit fraud and that Hecker's access to a Proxy Statement gave him the accurate information he needed to properly evaluate his share transfer. The Court shall therefore grant defendants' motion for summary judgment. The Court's reasoning is set out below.

### FACTUAL BACKGROUND

Defendant MTI manufactures semiconductor memory products. Through its subsidiaries, MTI also sells personal computers. In the early 1990s, Plaintiff Hecker, a retired Major General in the United States Air Force, helped MTI's Chairman Joe Parkinson sell personal computers to the Pacific Air Force Exchange Service in Hawaii. In consideration of Hecker's assistance, Parkinson made available to Hecker 1,000 Class A shares in a company which later became Micron Computer, Inc. (MCI). Hecker purchased the shares for $25,000, and with subsequent stock splits, owned 25,000 Class A shares in MCI by the end of 1994. There were a total of 987,500 Class A shares issued at that time, giving Hecker ownership of 2.5% of the Class A shares.

As Micron grew, Hecker provided further assistance. He introduced Micron representatives to Senator Fritz Hollings when Micron was interested in pursuing Japanese companies that were dumping computer chips at artificially low prices. Senator Hollings later held hearings that ultimately led to sanctions against the Japanese. Hecker followed his investment in MCI closely, regularly reviewing MCI's financial statements, Board of Directors' minutes, and other information that was not generally available to the public.

In June, 1994, MTI and ZEOS, a Minnesota-based manufacturer of personal computers, discussed a merger. In early October, 1994, the MTI Board of Directors authorized MTI's Chairman, Steven Appleton, to proceed with the merger. On October 30, 1994, MCI and Micron Custom Manufacturing Services (MCMS) signed a tentative Merger Agreement with ZEOS. On the same day, MTI signed a Voting Rights Agreement with ZEOS.

The Merger Agreement provided that MCI and MCMS would merge into ZEOS, and that the shareholders of these two MTI subsidiaries would receive publicly-traded ZEOS stock for their privately-held MCI and MCMS stock. The Merger Agreement provided that it may be "terminated and the Merger may be abandoned at any time" before the merger became effective, for a variety of reasons. The Agreement provided that either party could unilaterally terminate the merger by payment of a $2 million fee to the other party. The Merger Agreement also required that the merger take place only if approved by a majority of ZEOS, MCI, and MCMS shareholders. In the Voting Agreement, MTI agreed to vote its shares of stock in MCI and MCMS in favor of the merger.

Before the merger was closed on April 7, 1995, Hecker had four conversations with Appleton regarding the effect of the merger on Hecker's 25,000 Class A shares in MCI. In the first three conversations, Hecker in-

quired whether a conversion ratio had been established so that he could calculate the number of shares he would receive in the new company in exchange for his MCI shares. Appleton responded that the conversion ratio had not yet been calculated.

In the fourth conversation in March, 1995, Appleton allegedly made three fraudulent misrepresentations that form the heart of this lawsuit. The conversation began with Appleton requesting Hecker to give up 16,-050 shares of his 25,000 shares so that MTI would have a 79% ownership of the new merged entity. The three alleged fraudulent misrepresentations made by Appleton to Hecker are as follows: (1) That the merger would not go through unless MTI owned 79% of the new merged entity; (2) That Hecker's 16,050 shares were necessary to give MTI the 79% ownership; and (3) That all shareholders were being treated alike.

In early March, 1995, Micron sent to Hecker a Stock Contribution Agreement that provided that Hecker agreed to transfer the 16,050 shares on the day of the closing of the ZEOS merger. Along with that proposed Agreement, Micron also sent a preliminary Proxy Statement that included the Merger Agreement and Voting Agreement discussed above. Hecker signed the Stock Contribution Agreement and returned it to Micron. Hecker's signature on the Stock Contribution Agreement is not dated. Hecker does state, however, that he signed the Stock Contribution Agreement after receiving the Proxy Statement: "Hecker received the 200 page draft joint proxy only a day or two before he committed to transfer his stock ...." *See,* Brief of Hecker at 22. In addition, by signing the Stock Contribution Agreement, Hecker represented that he was "familiar with the terms of the Merger Agreement and the Merger and has *received and reviewed* a copy of Amendment No. 2 to the Joint Proxy Statement/Prospectus related to the Merger ...." (emphasis added).

Hecker asserts that in fact he did not read the Proxy Statement. He also asserts that "[h]e felt under pressure to sign the Stock Contribution Agreement because Appleton ... said they needed it back to the Board and asked him to fax it right back." *See,* Affidavit of Hecker at 8, ¶ 17.

The merger closed on April 7, 1995. Hecker asserts that if he did not transfer his 16,050 shares, they would have been converted into 679,185 shares of stock in the new entity, and would have been worth about $15 million. To recover that loss, he brought this suit. His complaint alleges three causes of action: (1) Securities fraud under Section 10(b)(5) of the Securities Act, 15 U.S.C. § 78j(b) and Rule 10b–5; (2) Common law fraud; and (3) Breach of fiduciary duty. Defendants have moved for summary judgment seeking to dismiss the entire suit. The Court will discuss each count after briefly reviewing the legal standard governing summary judgments.

## LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact that would allow a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence must be viewed in the light most favorable to the non-moving party, *Id.* at 255, 106 S.Ct. 2505, and the Court must not make credibility determinations. *Id.* The trial judge must determine whether the evidence presented is such that a jury applying the proper evidentiary standard could reasonably find for either the Plaintiff or the defendant. *Id.*

Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256–57. In meeting this burden, the non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This evidence must be admissible because "only admissible evidence may be considered in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir.1988).

## ANALYSIS

### 1. Securities Fraud Claim

■ To prevail on their securities fraud claim under section 10(b) and Rule 10b–5, Hecker must prove: (1) that defendants made a false statement or failed to disclose information that rendered another statement misleading; (2) that such statement or omission was material; (3) that plaintiffs relied on the statement or omission; and (4) that defendants acted with scienter or an intent to defraud. *See, Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir.1996).

In a securities fraud case, summary judgment is improper if a Plaintiff shows a genuine issue of fact "with regard to a particular statement by the company or its insiders." *Id.* at 1484. Thus, the Court "must examine each false or misleading statement allegedly made by defendants." *Id.*

■ The first allegedly fraudulent statement was Appleton's representation that MTI needed 79% ownership of the merged entity. Hecker asserts in his complaint that Appleton's statement is false because MTI had already pledged to vote all its shares in MCI and MCMS for the merger. But Hecker did not raise this ground in his response to the summary judgment and has thus waived it.

Hecker did argue that the 79% figure was merely a guideline and not a requirement. The 79% figure was derived from a resolution issued on October 10, 1994 by the Board of Directors of MTI that stated in part as follows:

[T]he Board hereby authorizes Steven R. Appleton to negotiate, finalize, and to take any action he deems necessary and appropriate to complete a transaction with Zeos Corporation in which Zeos, Micron Computer Inc., and Micron Custom Mfg., will be combined through merger by stock ex-

changes whereby Micron Technology will own at least 79% of the resulting entity. *See,* Exhibit 2 to Affidavit of Lewis.

Appleton himself describes the resolution as being "quite clear that I could move ahead with the transaction as long as Micron owned at least 79 percent of the resulting entity." *See,* Deposition of Appleton at 18, ll. 9–12. In response, Hecker cites a July 28, 1995, letter written by Appleton to Hecker describing the 79% figure as a "guideline." The use of the word "guideline," Hecker asserts, implies that MTI was willing to accept something less than 79%.

Hecker's argument is not persuasive for two reasons. First, the July 28, 1995, letter was written almost four months after the merger was closed on April 7, 1995. The crucial source document is the Board resolution, and it sets forth the 79% figure as a requirement. Second, Hecker takes the word "guideline" out of context. In his letter, Appleton does not use the word "guideline" to imply that MTI was willing to accept something less than 79% ownership. Instead, Appleton states in the letter that "if you [Hecker] had refused [to tender your stock], I would not have pursued the merger because I would then fall out of the 79% guideline set by the MTI Board ...." *See,* Exhibit 8 to Declaration of Clark. Appleton's meaning here is clear: The merger was off if ownership fell below 79%.

■ Hecker responds that even if 79% ownership was required, his shares were not needed to allow MTI to reach the 79% level. There is no dispute that Hecker's shares were not required if the 79% figure was calculated on a non-diluted basis.[1] On the other hand, Hecker does not dispute that his shares were required if the 79% figure was calculated on a diluted basis. These undisputed facts were available to Hecker in the Proxy Statement he examined before he signed the Stock Purchase Agreement:

Accordingly, after giving effect to the Merger, the shares of ZEOS Common

---

1. The term "non-diluted basis" refers to the calculation of total shares excluding all options and similar rights to acquire shares. The converse term, "diluted basis," refers to the calculation of total shares including all shares that would be issued and outstanding if all options and similar rights to acquire shares were exercised, in addition to the already issued and outstanding shares.

Stock owned by MTI would represent approximately (a) 79% of the number of shares of ZEOS Common Stock outstanding (assuming exercise of all outstanding options) and (b) 80% of the number of shares of ZEOS Common Stock actually outstanding (i.e., excluding shares issuable upon exercise of outstanding options).

Regardless of the conversion ratio used, it was obvious that Hecker's 16,050 shares would translate to a very small percentage of the total shares of the merged entity. The above-quoted paragraph from the Proxy Statement should have made Hecker very suspicious about MTI's need for his shares if the 79% ownership requirement was being calculated on a non-diluted basis. The clear message of the paragraph is that MTI would not need Hecker's shares to reach 79% on a non-diluted basis.

Hecker asserts, however, that he did not read the Proxy Statement. Nevertheless, "knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents." *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983). *See also, Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir.1991) ("Investors are charged with constructive knowledge of the risks and warnings contained in the private placement memoranda."). The Court is not faced here with a situation where the investor is a neophyte or the Proxy Statement is ambiguous. *See, Luksch v. Latham,* 675 F.Supp. 1198, 1202 n. 7 (N.D.Cal.1987) (suggesting that imputation of knowledge of written proxy materials is improper where investor was unsophisticated). Hecker had broad experience with both MTI and MCI. He regularly reviewed detailed financial information, used important contacts to further sales, and even introduced company officials to the United States Senator chairing crucial hearings on Japanese competition. Hecker was a sophisticated investor in MCI, and was very knowledgeable about MCI's parent, MTI. He was no armchair investor. And while reading the Proxy Statement would have been a long and tedious chore, it would have imparted the crucial information Hecker needed to make an informed investment decision.

The Ninth Circuit has held that "[i]f the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie." *Atari Corp. v. Ernst & Whinney,* 981 F.2d 1025, 1030 (9th Cir.1992). In the present case, Hecker had all the information necessary to determine that MTI's statement that they needed his shares to reach 79% depended on calculating that figure on a diluted basis.

There may have been fraud if Hecker had been told that the 79% requirement was being calculated on a non-diluted basis. In that event, he would have been tricked into giving up his shares because MTI reached the 79% figure on a non-diluted basis without his shares. But there is no evidence that any such representations were made to Hecker.

In like fashion, Hecker would have a fraud claim if there was some evidence that the Board would have accepted less than 79% ownership calculated on a diluted basis. But there is no such evidence. Hecker points out that the Board Resolution says nothing about the 79% figure being calculated on a diluted basis. He implies from the Resolution's silence that the Board was willing to accept something less than 79% ownership calculated on a diluted basis. But the Resolution's silence implies nothing. To conclude from the Board Resolution that the 79% figure was calculated on a non-diluted basis is speculation, not implication.

The heart of Hecker's fraud claim is that the Board would have accepted something less than what Appleton represented. There is no competent evidence to support that claim.

■ Finally, Hecker asserts that Appleton misrepresented the sacrifice other shareholders made to further the merger. Specifically, Hecker states that Appleton told him that "everyone is giving up something" to make the merger work, when in fact Hecker was the only shareholder who gave up shares. But Hecker concedes that other shareholders gave up book value, and he specifically recognizes that MCMS shareholders sacrificed a reduction in book value of 31%, and that MCI Class B common stockholders sacrificed a reduction in book value of 2%. *See,* Brief of

Hecker at 30. Thus, the undisputed facts back up Appleton's statement that other shareholders were giving up "something."

Hecker also asserts, however, that Appleton told him that "I was being treated like all other shareholders." *See,* Affidavit of Hecker at 4, ¶ 9. Hecker assumed that Appleton meant that not only were all shareholders making a sacrifice, but that all were sacrificing equally. Hecker asserts that Appleton's statement is fraudulent because Hecker sacrificed a great deal more than any other shareholder. But the compromises made by all the parties were fully disclosed in the Proxy Statement. By reading that document, Hecker would have seen that other shareholders were giving up not shares, but varying degrees of book value. Because Hecker had available to him—before he signed away his shares—full information on the compromises of other shareholders, there is no fraud. This is especially true here, where Appleton never represented that other shareholders were actually giving up shares, but instead made vague and general statements that Hecker interpreted in a certain way. Under these circumstances, the full information provided by the Proxy Statement defeats the fraud claim. *See, Atari,* 981 F.2d at 1030.

For all of these reasons, the Court shall grant the summary judgment to the extent that it seeks to dismiss the securities fraud claim.

### 2. *Fraud and Breach of Fiduciary Duty*

■ To show fraud, Hecker must show each of the following by clear and convincing evidence: (1) a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that the representation will be acted upon in a reasonably contemplated manner; (6) the listener's ignorance of its falsity; (7) the listener's reliance on the truth of the representation; (8) the listener's right to rely on the truth of the representation; and (9) the listener's consequent and proximate injury. *See, Weatherhead v. Griffin,* 123 Idaho 697, 701, 851 P.2d 993, 997 (Ct.App.1992).

Hecker makes the same claims here that he made in his securities fraud claim, and the analysis is similar: (1) There is no evidence that Appleton's insistence that the Board re-

quired a 79% ownership level is false; (2) There is no evidence that Hecker's shares were not required to meet the 79% level, and Hecker was not justified in inferring that the 79% level was calculated on a non-diluted basis; and (3) The Proxy Statement shows the sacrifices that other shareholders made to put together the merger, and Hecker had that information available to him before he committed his shares. Under these circumstances, the common law fraud claim must also be dismissed.

■ Hecker's claim for breach of fiduciary duty does not allege any misconduct other than the alleged fraud discussed above. Because there is no fraud as a matter of law, the breach of fiduciary duty claim must be dismissed as well. In addition, Hecker's transfer of shares was inextricably intertwined with the merger. The Stock Contribution Agreement which he signed recites that he transferred his shares to induce MCI and MCMS to enter into the merger. In fact, the Agreement provided that the transfer of the shares would occur at the closing of the merger. Because the transfer was so tied to the merger, Hecker's sole remedy, absent fraud, lies in the Idaho dissenting shareholder appraisal statute, I.C. § 30–1–80. That statute essentially provides that if the corporation "takes an action which fundamentally alters the character of the shareholders' investment," the "dissenter is allowed to demand that the corporation buy back his shares at fair value . . . ." *Waters v. Double L, Inc.,* 114 Idaho 256, 259, 755 P.2d 1294, 1297 (Ct.App.1987), *modified on other grounds,* 115 Idaho 705, 769 P.2d 582 (1989). The statute is designed to prevent a shareholder like Hecker from enjoying the benefits of a merger while at the same time reaping profits from the increased value of shares that he had to sacrifice to allow the merger to proceed. *See, Burke v. Jacoby,* 1991 WL 221417, [1992 Tr.Binder] Fed.Sec. L.Rep.(CCH) ¶ 96,499 (S.D.N.Y.1991), *aff'd,* 981 F.2d 1372 (2d Cir.1992). In the absence of fraud, the statute provides that the shareholder "shall have no right at law or in equity to attack the validity of the corporate action . . . ." In this case, Hecker's fraud claim has been dismissed and he has brought no claim under I.C. § 30–1–80. By the terms of that

statute, his breach of fiduciary duty claim must be dismissed.

## CONCLUSION

The Court therefore finds that summary judgment should be granted to defendants dismissing this case. The Court will grant the motion in a separate order as required by Fed.R.Civ.P. 58.